UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UNITED STATES OF AMERICA,

   -v-                                                                                          No. 12 Cr. 337 (LTS)

RAFAEL ESPINO-URVAN,

       Defendant.

-------------------------------------------------------x

## MEMORANDUM OPINION AND ORDER

        Defendant Rafael Espino-Urvan, charged pursuant to 21 U.S.C. § 846 in a one-count Indictment with conspiracy to possess heroin with intent to distribute it in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), moves to suppress: the heroin found in the car that he was driving on the day of his arrest; cellular phones found in the car; all subsequent evidence recovered in a search of the phones; and statements allegedly made by Mr. Espino-Urvan to law enforcement following his arrest. The Court held an evidentiary hearing on Mr. Espino-Urvan's motion on November 29, 2012, which was continued on February 14, 2013. Drug Enforcement Agency ("DEA") Task Officer/IRS Special Agent Gerard Ricciardi ("SA Ricciardi"), Special Agent Sabrina May ("SA May") and Special Agent Kevin Larkin ("SA Larkin") testified. The Government also produced transcripts of consensual recordings of conversations between SA Ricciardi's confidential source (the "CS") and Mr. Espino-Urvan's co-defendant, Manuel Antonio Lantigua, from March 27, 2012 – the evening on which Mr. Lantigua and Mr. Espino-Urvan were arrested. After the suppression hearing concluded, the Court took the matter under advisement and the parties submitted post-hearing memoranda. The Court has considered carefully all of the parties' submissions and arguments and, for the following reasons, Mr.

Espino-Urvan's motion is granted in its entirety.  This Memorandum Opinion and Order constitutes the Court's findings of fact for purposes of Fed. R. Crim. P. 12(d) and conclusions of law.

FACTUAL BACKGROUND

The Court, having considered carefully the testimony and demeanor of the witnesses and the other evidentiary submissions, finds the essential facts as follows.  In or about February 2012, based on information from the CS that Mr. Lantigua supplied heroin, the DEA began investigating Mr. Lantigua.  (Nov. 29, 2012, Tr. 5:9-21.)  SA Ricciardi and other DEA agents conducted surveillance of Mr. Lantigua's meetings with the CS, and were able to identify the car that Mr. Lantigua drove – a black Dodge Charger.  (Id. at 5:22-6:3.)  The DEA's investigation culminated on March 27, 2013, when, according to SA Ricciardi, the CS spoke with Mr. Lantigua and they agreeed on a meeting during which Mr. Lantigua would sell and the CS would ostensibly purchase a quantity of heroin for a set price.  (Id. at 6:4-12.)  Mr. Lantigua and the CS were to meet at a BP gas station, located on Third Avenue in the Bronx, New York, just off of the Cross Bronx Expressway.  (Id. at 6:13-16.)  SA Ricciardi's team set up surveillance at the site in advance of the meeting.  (Id. at 6:17-23.)

SA Ricciardi was positioned on Third Avenue, across the street from the BP gas station and, while waiting for Mr. Lantigua to arrive, he maintained contact with the CS by telephone and was in communication with the other agents on his team.  (Id. at 7: 19-21; 9:4-10.) The calls between the CS and Mr. Lantigua were recorded, but those between SA Ricciardi and the CS were not recorded.  (Id. at 29:1-13.)  The agents could have listened to the calls between the CS and Mr. Lantigua contemporaneously, but that was not done in this investigation.  (Id. at

22: 21-23:3.) According to SA Ricciardi, when the CS told SA Ricciardi that "they're on their way," the CS "made it sound like [Mr. Lantigua] was coming with somebody else. So I made everybody aware that [Mr. Lantigua] could be coming with another individual in the car. So I would arrange to have more agents approach that car because now we know that there are two in the car." (Id. at 9:16-10:13.) SA Ricciardi relayed this information to his team over the radio, telling them to watch for "Manny's car, they're on their way." (Id. at 10:18-19.)

In connection with the November 29, 2012, hearing, the Court also requested that the Government produce transcripts of the telephone calls that took place on March 27, 2013, between the CS and Mr. Lantigua. SA Ricciardi testified that he maintained regular telephone communication with the CS in order to stay "advised of the status of the proposed meet." (Nov. 29, 2012, Tr. 28:12-25.) SA Ricciardi also testified that he was not aware of any other conversations that Mr. Lantigua and the CS had on March 27, 2013, other than the phone calls that were recorded, or of any other meetings between the two of them. (Id. at Tr. 31:2-19.) The transcribed phone calls between SA Ricciardi and the CS were brief and mainly concerned the logistics of the meeting. At 7:03 p.m., when the CS asked how long he would be, Mr. Lantigua said "I'll call you once I got that." At 7:29, Mr. Lantigua said "I'm going to be, like, like fifteen minutes because I'm waiting for another vehicle to pick that up . . . Because I don't, I don't got a vehicle for that." At 8:09, when the CS again asked how long, Mr. Lantigua said that he was on the way and when asked if he wanted to meet "right there on Webster," Mr Lantigua said "[n]o, I meet you right there at the gas, at the gas station." At 8:14 p.m., Mr. Lantigua told the CS "I'm right here."

SA May was a member of the surveillance team that evening. She set up surveillance on Third Avenue, northeast of 174th Street, facing the Cross Bronx Expressway, in

front of the stoplight located at the intersection of 174th Street and Third Avenue. (Id. at 69: 7-15.) SA May first saw Mr. Espino-Urvan's black Dodge Charger with Pennsylvania license plates (which she recognized from prior surveillance) driving east on 174th Street, when it stopped at a red light. A black Cadillac Escalade was behind the Charger at the light. (Id. at 69:16-19.) However, it was not until the cars turned onto Third Avenue that SA May suspected that the Escalade was following the Charger. (Id. at 81:9-12.) "Both vehicles slowly made a turn on to Third Avenue going towards the Cross Bronx Expressway. The Cadillac Escalade was following closely behind the Dodge Charger and they were both going unusually slow." (Id. 69:18-22.) SA May recalled that there are two northbound lanes on Third Avenue, so the Escalade could have passed the Charger at any time and the Escalade did not honk at the Charger or try to get around it. (Id. at 70:2-7.) SA May radioed to the rest of the team that she had just seen Mr. Lantigua's black Charger and that it looked like Mr. Lantigua's vehicle was being followed by another vehicle, which SA Ricciardi said that she described as a "black Escalade." (Id. at 10:22-11:1.)

       During cross-examination, SA May acknowledged that, if the car behind the Charger had wanted to go into the gas station, which was on the right, it would not necessarily have passed the Charger on the left. (Id. at 83:4-84:2.) The two vehicles traveled "several yards" on Third Avenue together (id. at 77:19-25), which did not take more than seconds (id. at 78:18-19). SA May saw the Escalade turn right into the gas station, while the Charger made a U-turn and parked on Third Avenue across the street from the gas station. (Id. at 70:16-71:2.)

       SA Ricciardi did not see Mr. Lantigua's vehicle until it went right past him, "made a U-turn and parked maybe two, three car lengths behind me." (Id. at 11:8-10.) SA Ricciardi said that he also noticed the black Escalade, which was "really going slow," traveling

with Mr. Lantigua's car.  (Id. at 11:7-18.)  "As [Mr. Lantigua] made a U-turn, the black Escalade made a right-hand turn into [the driveway of the gas station] . . . and went all the way deep into the parking lot" and "nooked" into the corner by the vacuums.  (Id. at 11: 18-24.)  According to SA Ricciardi, the Charger and the Escalade "appeared to be together" as they had been driving slowly on a busy street; the Charger made a U-turn, turning right, and the Escalade turned right into the parking lot of the gas station; and the CS confirmed that Mr. Lantigua had arrived by saying "they're there."  (Id. at 12:5-16.).

       The surveillance team surrounded both vehicles and SA Ricciardi approached the Escalade, the vehicle that had not been identified as belonging to Mr. Lantigua, and "waved" the driver, Mr. Espino-Urvan, out of the car.  (Id. at 13:5-10.)  SA Ricciardi had his gun drawn.  (Id. at 55:20- 56:1.)  SA Ricciardi "mov[ed] [Mr. Espino-Urvan] to the rear of the vehicle . . . towards Third Avenue to the back of the car."  (Id. at 13:13-18).  When he went up to the Escalade to ask Mr. Espino-Urvan to step out of the car, SA Ricciardi did not see anything inside the car.  (Id. at 45:19-20.)  At the time of the hearing, SA Ricciardi was not sure if he had ever seen the package of drugs that SA Larkin testified that he subsequently recovered from the car.  (Id. 46:3-15.)

       While at the back of the car, SA Ricciardi questioned Mr. Espino-Urvan about the ownership of the car and his purpose in coming to the station.  Mr. Espino-Urvan answered the questions.  (Id. at 13: 21-25.)  Meanwhile, after SA Ricciardi had removed Mr. Espino-Urvan from the Escalade, he saw SA Larkin approach the open driver's door of the vehicle, look in and give a "thumbs-up."  (Id. at 14:15-15:8.)  SA Ricciardi understood the thumbs-up sign as meaning that SA Larkin had found drugs.  (Id. at 15:7-8.)

       SA May pulled her car into the gas station behind the Escalade, and approached

the car on the passenger side.  The agents "ordered the driver out of the vehicle" and then SA May went to the rear of the vehicle with SA Ricciardi  (Id. at 71:10-23).  SA May testified that, when she went up to the car with the other agents, she "couldn't see anything inside of the vehicle except for the driver."  (Id. at 80:12-14.)  She saw SA Larkin give a sign to indicate that drugs were in the car.  (Id. at 71:12-15.)  SA Ricciardi put Mr. Espino-Urvan under arrest and handcuffed him.  (Id. at 15: 11-12.)

SA Larkin, who was also a member of the surveillance team, went first to the target vehicle, the Charger, which Mr. Lantigua was driving, and then returned to his car and "drove across the street into the gas station" to the Escalade.  (Id. at 88:5-18.)  SA Larkin testified that, when he arrived, he saw SA Ricciardi and SA May at the rear of the Escalade "with somebody" and so he went to the front of the vehicle, where the driver's side door was open.  (Id. at 88:5-18.)  SA Larkin further testified that, when he poked his head into the car to make sure that no one else was in the car, he saw a bag of heroin lying "on top" of the center console. (Id. at 88:22-89:19.)  SA Larkin described the object he saw on the console as a plastic bag with an "off-whitish powdery substance that in [SA Larkin's] experience was a bag of drugs."  (Id. at 89:15-17)  On cross-examination, SA Larkin explained that he had been able to see the off-whitish powdery substance through the bag.  (Id. at 92:16-23.)  The drugs were in the compartment in the center console, which was open with the "flap" up. (Feb. 14, 2013, Tr. 18:1-21.)  SA Larkin, at one point, testified that he did not know if the bag containing heroin was in some other bag (Nov. 29, 2012, Tr. 95:2-4), and, at another point, he said that he did not remember it being in another bag, and that the bag he saw the heroin in was "clear."  (Feb. 14, 2013, Tr. 26:15-27:19.)

At the February 14, 2013, session of the hearing, the Government introduced the

drugs into evidence as Government Exhibit 3.  Exhibit 3 was comprised of two separate bags of drugs packaged together.  One was a "food saver" bag containing about half a kilogram of heroin and the other was a small plastic bag containing approximately 2.4 grams of heroin.  (Feb. 14, 2013, Tr. 5:8-11; 8:10-24.)  Also within the Government's Exhibit 3 was an opaque black plastic bag, which SA Larkin testified that he did not remember seeing on March 27, 2012.  (Id. at 5:13-16.)  SA Larkin testified that he recalled seizing from the Escalade the half a kilogram of heroin in the food saver bag.  (Id. at 5:3-12.)  In response to the Court's clarification questions, SA Larkin stated that he believed that the heroin produced at the hearing had been repackaged in the lab and that it was not inside the same bag as when it was seized at the scene.  (Id. at 30:2-31:9.)  He said that the original bag may have been folded and placed inside another smaller plastic bag that also was inside the evidence envelope.  (Id. at 32:5-21.)  SA Larkin also testified that he did not know where the bag came from that contained the approximately 2 grams of heroin.  (Id. at 33:2-7.)

## DISCUSSION

The Government opposes Mr. Espino-Urvan's motion on several different grounds.  The Government first argues that there was probable cause to arrest Mr. Espino-Urvan and that all of the evidence recovered was thus lawfully seized from the car once the agents observed Mr. Espino-Urvan's Escalade driving "in tandem" with Mr. Lantigua's Charger.  In the alternative, the Government argues that the initial questioning of Mr. Espino-Urvan was merely a Terry stop[1] for which only reasonable suspicion was required and that the subsequent search of the vehicle was lawful after SA Larkin saw the heroin in plain view.

---

[1] See Terry v. Ohio, 392 U.S. 1 (1968).

Probable Cause

"On a motion to suppress evidence in a criminal trial, once [the defendant] has established a basis for his motion, the burden rests on the Government to prove, by a preponderance of the evidence, the legality of the actions of its officers." United States v. Peterson, No. 12 Cr 409(PAE), 2012 WL 4473298, at *6 (S.D.N.Y. Sept. 28, 2012).  In order to stop a car or to arrest a person, the police must have either "probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct." United States v. Scopo, 19 F.3d 777, 781-82 (2d Cir. 1994) (internal quotation marks and citation omitted).  "Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." United States v. Patrick, 899 F.2d 169, 172 (2d Cir. 1990) (quoting Brinegar v. United States, 338 U.S. 160, 175-76 (1949)).  The determination of probable cause requires "a practical, common-sense decision, whether given all the circumstances . . . there is a fair probability that contraband . . . will be found in a particular place." United States v. Harwood, 998 F.2d 91, 96 (2d Cir. 1993) (internal quotation marks and citation omitted) or that "[a] person of reasonable caution would be justified in believing that there was at least 'a probability or substantial chance of criminal activity.'" United States v. Medina, 459 F. App'x 31, 32 (2d Cir. 2012) (quoting Illinois v. Gates, 462 U.S. 213, 244, n. 13 (1983)).  "Under the 'automobile exception' to the Fourth Amendment warrant requirement, police may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." United States v. Gaskin, 364 F.3d 438, 456 (2d Cir. 2004).

Driving in Tandem

The Government asserts that the agents had probable cause to stop and arrest Mr. Espino-Urvan because his car had been traveling in tandem with Mr. Lantigua's car. This probable cause was, according to the Government, the product of information from the CS indicating that Mr. Lantigua would not be alone, and the observations of the agents on the scene, principally SA May. The Government relies on a Tenth Circuit decision, United States v. Rodriguez-Rodriguez, 550 F.3d 1223, 1228 (10th Cir. 2008), for support of its argument that in certain circumstances "sufficient evidence that two vehicles are driving in tandem plus evidence that one vehicle contains contraband can provide probable cause sufficient to support arresting the driver of the other vehicle." In Rodriguez-Rodriguez, officers observed a brown pickup truck driving two car lengths behind a red Nissan on "a highway in very light traffic during the predawn hours of the morning" in New Mexico. Id. at 1225, 1229. Both vehicles had California license plates and were in the right lane, driving approximately five miles per hour below the speed limit. Id. at 1225. The officer testified that he saw the driver of the Nissan veer repeatedly into the left lane, look at the truck and return to the right lane and that, when the truck was pulled over for a legitimate traffic stop, the Nissan accelerated rapidly. Id. at 1229. The officer who pulled the truck over discovered a large amount of marijuana and so he radioed that the driver of the red vehicle was suspected of narcotics trafficking and the red Nissan was stopped some six miles away. Id. at 1126. The Tenth Circuit emphasized that there was "considerable objective evidence" and that "the facts supporting probable cause in this case are unquestionably stronger than the facts this court deemed insufficient [in a case] in which two vehicles travel some distance apart on a crowded highway." Id. at 1229.

Similarly, in United States v. Allen, 705 F.3d 367, 368 (8th Cir. 2013), the other

case on which the Government principally relies, an Arkansas police officer noticed what appeared to be a green rental SUV with Texas license plates traveling on an interstate in Arkansas, approximately four car lengths behind a white rental minivan that also had Texas plates. The officer testified that he knew that Texas was a "source state" for narcotics coming into Arkansas and that vehicles transporting narcotics often traveled in tandem. Id. at 368. He also noted that the driver of the minivan "appeared nervous" and that the rear seats were folded down. Id. After "one or two minutes" of observation, he initiated a traffic stop of the white minivan. Id. When the officer approached the vehicle he smelled marijuana, and so he placed the driver under arrest and radioed his fellow officers to tell them that he had discovered marijuana in the minivan and to stop the green SUV, which he suspected was traveling with the white minivan. Id. at 369. The Eighth Circuit held that "it was not unreasonable to initiate a brief stop of the green SUV to investigate its possible association with the white minivan" given the facts of the case. Id. at 370.[2]

        However, the Supreme Court has long cautioned that, "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause . . . ." Ybarra v. Illinois, 444 U.S. 85, 91 (1979). In most other cases in which a court has held that the fact that two vehicles were traveling "in tandem" provided probable cause for the arrest of a driver or the seizure of evidence, there were other facts cited in support of the probable cause determination. See, e.g., United States v. Juarez, 408 F. App'x 183, 188 (10th Cir. 2011) (informant warned officers that two vehicles would leave the

---

[2] The Government also cites United States v. Zamudio-Carillo, 499 F.3d 1206, 1207 (10th Cir. 2007) (where two vehicles with consecutively numbered Arizona speciality license plates drove a quarter of a mile apart along a Kansas interstate highway). Neither the obvious connection between the vehicles nor the length of time that they were observed traveling together is a factor present here.

apartment together and drive in tandem and the officers observed what informant predicted); United States v. Owens, 101 F.3d 559, 561-62 (8th Cir. 1996) ("[w]e do not hold today that a car can be stopped without a warrant merely because that car is driving in tandem with another vehicle whose occupants (of the latter vehicle) are reasonably suspected of criminal conduct; rather, it is one factor to be considered in determining whether reasonable suspicion exists," and emphasizing that the occupants of the two cars had been traveling together "at least from the time the group had checked into the Roadway Inn").

In this case, SA May testified that she saw Mr. Lantigua's car (the Charger) at a stoplight with Mr. Espino-Urvan's car (the Escalade) right behind it. When the light changed, both cars turned at the intersection. It was not until the cars turned onto Third Avenue, however, that SA May suspected that the Escalade was following the Charger. SA May testified that she only watched the cars travel together for "several yards" over a matter of seconds. (Nov. 29, 2013, Tr. 77:20-78:20.) Surveillance during such a brief period of time and over such a limited distance is not sufficient to support a determination that the cars were driving "in tandem." Even crediting SA May's testimony that the Charger and Escalade were traveling "unusually slowly," this information is not necessarily probative, as the cars were traveling on a crowded street[3] and any vehicle behind the Charger intending to turn right into the gas station would likely have been forced to travel at the same speed. As SA May testified, if the Escalade had tried to pass the Charger on the left, its driver would then have had to "cut off" the Charger when turning right into the gas station. (Nov. 29, 2013, Tr. 84:1-2.)[4] None of the corroborating circumstances

---

[3]   As SA Ricciardi testified, there was "traffic moving in both directions . . . going on all night." (Nov. 29, 2013, Tr. 36:20-25.)

[4]   Similarly, the fact that the driver of the Escalade did not "honk" at the driver of the Charger does not necessarily indicate that they were driving in tandem, as the

outlined in the aforementioned cases are present here.  See, e.g., United States v. Valenzuela, 365 F.3d 892, 897-98 (10th Cir. 2004) (cautioning that the court cannot "arrive at probable cause simply by piling hunch upon hunch" and that when the Government's rhetoric was stripped away, there were "only two facts – both vehicles had Arizona plates and both were heading toward Arizona on an Interstate highway.  Hardly unusual").

To support its "driving in tandem" argument, the Government contends that the agents knew that two cars would be coming together, thus providing them with another reason to think that Mr. Espino-Urvan was traveling in tandem with Mr. Lantigua.  SA Ricciardi testified that the CS told him that Mr. Lantigua might be arriving to the gas station with another person.  However, SA Ricciardi is not aware of any conversations that the CS had with Mr. Lantigua that day that were not transcribed, and nowhere in the transcribed conversations does the CS mention that two cars would arrive together.  The Government referred the Court to the 7:29 p.m. call, in which Mr. Lantigua said, "I'm going to be, like, like fifteen minutes because I'm waiting for another vehicle to pick that up . . . Because I don't, I don't got a vehicle for that," as indicating that Mr. Lantigua would be coming to the gas station with another vehicle, but this interpretation is not credible in the context of the other telephone calls in which Mr. Lantigua refers repetitively to himself in the singular first person (e.g., "once I got that" and "I meet you at the gas station").  Moreover, even if the Court credits SA Ricciardi's testimony that he "remembers calling out there could be more than one guy in the car," there is no evidence that agents would have been alerted to look for a second vehicle.  (Nov. 29, 2013, Tr. 29:18-23.)  Accordingly, the Government has not proffered sufficient evidence to establish that the officers had probable cause to arrest Mr. Espino-Urvan on the basis of the fact that his vehicle was allegedly driving in

---

distance that SA May observed them driving together was so short.

tandem with Mr. Lantigua's vehicle.

Terry Stop

        Law enforcement officers may stop and briefly detain a person or a vehicle if the officer has a reasonable suspicion that "criminal activity may be afoot," Terry, 392 U.S. at 30, although the officer must be able to articulate something more than a general suspicion or hunch. Id. at 27.  Law enforcement officers are said to have a "reasonable suspicion" when they are "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion . . ."  United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975). "Reasonable suspicion" is measured objectively, reviewing the circumstances as a whole. United States v. Glover, 957 F.2d 1004, 1009-10 (2d Cir. 1992); see also, United States v. Arvizu, 534 U.S. 266, 273-74 (2002) (reasonable suspicion exists if the stop is warranted by the totality of the circumstances).  The Terry stop principle applies to both persons and automobiles: law enforcement officers may stop moving automobiles in order "to investigate a reasonable suspicion that its occupants are involved in criminal activity."  United States v. Hensley, 469 U.S. 221, 226 (1985).

        "[O]nce a motor vehicle has been lawfully detained [pursuant to Terry], the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."  Arizona v. Johnson, 555 U.S. 323, 331 (2009) (internal quotation marks and citation omitted).  "Although [courts] have found that reasonable suspicion is 'not a high threshold,' it still requires an 'objective justification' for making a stop."  United States v. Rivera, 353 F. App'x 535, 536 (2d Cir. 2009) (internal citations omitted).  Reasonable suspicion is determined based on the "totality of the circumstances," but "the likelihood of criminal activity need not rise to the level required for probable cause, and it

falls considerably short of satisfying a preponderance of the evidence standard." Arvizu, 534 U.S. at 273-74 (internal quotation marks and citations omitted). "Any evidence seized based upon an illegal stop 'is subject to the fruit of the poisonous tree doctrine,' and may be suppressed." Scopo, 19 F.3d at 781 (citation omitted).

      Here, the deficiencies that plague the Government's probable cause argument similarly undermine its argument that the agents had reasonable suspicion for stopping Mr. Espino-Urvan and asking him to step out of the vehicle. The Charger and Escalade were not observed for a sufficient amount of time or distance by the agents to support a reasonable conclusion that they were traveling in tandem. Nothing was said by Mr. Lantigua in the conversations between the CS and Mr. Lantigua that day that would lead a reasonable person to believe that Mr. Lantigua would be arriving with a second, separate vehicle. Furthermore, when the two cars arrived, there was no communication between them and they parked in separate areas. Nonetheless, for the purposes of this analysis, the Court will assume that SA Ricciardi's belief, derived from his conversations with the CS and allegedly expressed to the other agents, that Mr. Lantigua would be coming with another person, combined with SA May's testimony that she saw the two cars traveling together, provided the agents with reasonable suspicion to perform a Terry stop and ask Mr. Espino-Urvan to step out of the vehicle.

      "The Fourth Amendment generally requires police to secure a warrant before conducting a search." Maryland v. Dyson, 527 U.S. 465, 466 (1999) (per curiam). However, an "investigatory stop is permissible under the Fourth Amendment if supported by reasonable suspicion . . . and a warrantless search of a car is valid if based on probable cause . . . " Ornelas v. United States, 517 U.S. 690, 693 (1996) (internal citations omitted). The agents' reasonable suspicion may have justified asking Mr. Espino-Urvan to step out of the vehicle, but there was

no probable cause to believe that the Escalade contained contraband or other evidence of a crime meriting a warrantless search of the vehicle. Therefore, without seeing the heroin in plain view, the agents did not have probable cause to arrest Mr. Espino-Urvan or to search the rest of the vehicle.

Plain View

Although "[t]he Fourth Amendment generally requires police to secure a warrant before conducting a search," Dyson, 527 U.S. at 466, "[i]t has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced into evidence." Washington v. Chrisman, 455 U.S. 1, 14, n.4 (1982) (citation omitted). To withstand a defendant's motion to suppress, however, a police officer's access to the object seized in plain view must have been permitted under the Fourth Amendment and the officer must have had "probable cause to suspect that the item [was] connected with criminal activity." United States v. Gamble, 388 F.3d 74, 76 (2d Cir. 2004) (citations omitted). In other words, "police may lawfully seize an object without a warrant if: (a) they are lawfully in a position from which they can view the object; (b) its incriminating character is immediately apparent; and (c) the officers have a lawful right of access to the object." United States v. Pughe, 441 F. App'x 776, 777 (2d Cir. 2011) (quoting Horton v. California, 496 U.S. 128, 136 (1990)). In order for an item's criminal nature to be "immediately apparent," a reasonable agent must be able to conclude that there is probable cause to believe that the item constitutes evidence or fruit of the crime without conducting some further search of the object. See United States v. Grubczak, 793 F.2d 458, 461 (2d Cir. 1968).

The Court does not find that SA Larkin's testimony that he looked into the parked car and saw the drugs in plain view credible. SA Larkin testified that, after Special Agents May

and Ricciardi had already secured Mr. Espino-Urvan at the back of the car, SA Larkin peeked into the car and noticed, on the console, between the front seats, a clear bag filled with what looked like heroin.  Despite having surrounded the car and having asked Mr. Espino-Urvan to step out of the vehicle, neither SA Ricciardi nor SA May had previously noticed this bag of drugs.  SA Larkin testified at first that he did not know if the bag containing heroin was packaged in another bag.  (Nov. 29, 2012, Tr. 95:2-4.)  The Court finds it improbable that a drug dealer would transport heroin in a transparent bag and then leave that bag displayed in an open compartment, instead of just closing the top when he saw the agents approaching.  It is also not clear, that, at night, from outside the vehicle, it would have been immediately apparent to anyone that the plastic bag contained drugs.  Furthermore, there is evidence that the heroin may have been enclosed within a black plastic bag in addition to a sealable clear bag.

When the Government introduced Exhibit 3 at the February 14, 2013, hearing, the Exhibit included two separate bags of drugs packaged together.  One was a "food saver" bag containing about half a kilogram of heroin and the other was a small plastic bag with approximately 2.4 grams of heroin.  There was also an extra empty black opaque plastic bag within the packaging.  SA Larkin testified then that he recalled finding the half a kilogram of heroin in the food saver bag in the Escalade (Feb. 14, 2013, Tr. 5:3-12), but that he did not know where the bag came from that contained the approximately 2 grams of heroin (id. at 33:2-7).  SA Larkin also said that he did not recall seeing the opaque plastic bag on March 27, 2013.  (Id. at 5:13-16.)  In light of the fact that all of the three different bags were packaged together in a sealed and labeled evidence bag, the Court infers that they were all recovered from the Escalade with the drugs that evening, and the Court does not find credible SA Larkin's testimony that the clear bag was lying in the car in plain view.

As there was no clear and unambiguous consent given by Mr. Espino-Urvan to search the car, see United States v. Puglisi, 790 F.2d 240, 243 (2d. Cir 1986), the seized heroin, and any other evidence recovered in the search of the Escalade, must be suppressed.[5]  See also Murray v. United States, 487 U.S. 533, 536 (1988) (citations omitted) (where the Government cannot show that a warrantless search falls within any exception to the warrant requirement, the search is deemed unlawful and any "evidence of tangible materials seized during [the] unlawful search and of testimony concerning knowledge acquired during [the] unlawful search" must be excluded).  As the Court finds that the arrest of Mr. Espino-Urvan was unlawful, any statements made by Mr. Espino-Urvan to law enforcement agents after his arrest must also be suppressed as the fruit of the illegal arrest.  See, e.g., U.S. v. Bonczek, No. 08 Cr. 361(PAC), 2008 WL 4615853, at *13 (S.D.N.Y. Oct. 16, 2008) (statement after illegal arrest was "obtained impermissibly, as the result of a warrantless arrest . . . and must be suppressed").

CONCLUSION

Accordingly, Mr. Espino-Urvan's motion to suppress the physical evidence seized from Mr. Espino-Urvan and from the Escalade; all subsequent evidence recovered after a

---

[5]  SA Ricciardi testified that, while at the rear of the vehicle, he asked Mr. Espino-Urvan if it would be okay to look inside and Mr. Espino-Urvan gestured in response with his hand and head which the agent interpreted as "consent," after SA Larkin had already approached the Escalade.  (Nov. 29, 2013, Tr. 46:16-25.)  This gesture was not mentioned in any of the agents' reports from the evening.  (Id. at Tr. 48:3-23.)  "The Government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary."  United States v. Isiofia, 370 F.3d 226, 230 (2d Cir. 2004).  Here, other than SA Ricciardi's testimony that Mr. Espino-Urvan gestured his consent to the search of the car, the Government has not proffered any evidence establishing that Mr. Espino-Urvan voluntarily and unambiguously consented to the search.

search of that evidence; and any statements made to law enforcement in the context of the arrest, is granted.  The next pretrial conference in this case will be held on **April 29, 2013, at 12:30 p.m**.

This Memorandum Order resolves docket entry number 14.

SO ORDERED.

Dated: New York, New York
April 23, 2013

>                      /S
> LAURA TAYLOR SWAIN
> United States District Judge